**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LONDON DIVISION**

**CIVIL ACTION NO.:**_____

| | |
|---|---|
| THE MONTICELLO BANKING COMPANY | ) |
| 50 N. Main Street | ) |
| Monticello, Kentucky 42633 | ) |
| | ) |
| CITIZENS DEPOSIT BANK OF ARLINGTON, INC. | ) |
| 1 Walnut Street | ) |
| Arlington, Kentucky 42021 | ) |
| | ) |
| FIRST COMMUNITY BANK OF THE HEARTLAND, INC. | ) |
| 114 E. Jackson Street | ) |
| Clinton, Kentucky 42031 | ) |
| | ) |
| FIRST SOUTHERN NATIONAL BANK | ) |
| 27 Public Square | ) |
| Lancaster, Kentucky  40444 | ) |
| | ) |
| MORGANTOWN BANK & TRUST COMPANY | ) |
| 201 N. Main Street | ) |
| Morgantown, Kentucky 42261 | ) |
| | ) |
| THE FARMERS BANK OF MILTON, KY | ) |
| 41 Ferry Street | ) |
| Milton, Kentucky 40045 | ) |
| | ) |
| THE PEOPLES BANK, MARION, KENTUCKY | ) |
| 116 S. Main Street | ) |
| Marion, Kentucky 42064 | ) |
| | ) |
| THE SACRAMENTO DEPOSIT BANK | ) |
| 335 Main Street | ) |
| Sacramento, Kentucky 42372 | ) |
| | ) |
| KENTUCKY BANKERS ASSOCIATION | ) |
| 600 W. Main Street, Suite 400 | ) |
| Louisville, Kentucky 40202, | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |

CONSUMER FINANCIAL PROTECTION )
 BUREAU and ROHIT CHOPRA, in his official )
 capacity as the Director of the Consumer )
 Financial Protection Bureau )
1700 G St. NW )
Washington, D.C. 20552, )
 )
        Defendants. )
_____)

Plaintiffs, for their Complaint For Declaration Of Rights And For Injunctive Relief against Defendants, allege as follows:

### Nature Of The Action

1. This is an action to declare unlawful and invalid the final rule promulgated by the Defendant, Consumer Financial Protection Bureau (the "CFPB" or the "Bureau"), to implement Section 1071 of the Dodd-Frank Wall Street Reform And Consumer Protection Act of 2010, Pub. L. 111-203, tit. X, Section 1071, 124 Stat. 1376, 2056 (2010), codified at 15 U.S.C. § 1691c-2 ("Section 1071"). The CFPB's final rule, the "Small Business Lending Rule" or the "Final Rule", amends Regulation B of the Equal Credit Opportunity Act (the "ECOA"), to create a massive new small business data collection and reporting requirement well beyond that contemplated or authorized by Section 1071. It is generally codified at 12 C.F.R. §1002.101 to §1002.114. It was formally published in the Federal Register on May 31, 2023. *See* Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), 88 Fed. Reg. 35115, 2023 WL 3723408 (May 31, 2023). As alleged more fully herein the Small Business Lending Rule was promulgated contrary to several requirements of the Administrative Procedure Act, 5 U.S.C. §551 *et seq.* (the "APA"). In addition, the entire funding mechanism for the CFPB is unconstitutional, and this fundamental defect invalidates the Small Business Lending Rule as well.

2.      Assuming that the Small Business Lending Rule were to survive the APA and funding deficiencies the Plaintiffs will be presenting in this action, this is also an action to obtain a declaration as to the ability of the Plaintiff banks to discuss with their customers the Small Business Lending Rule, including advising them that they have the right under 15 U.S.C. §1691c-2(c) to "refuse to provide any information requested" under the Small Business Lending Rule.  As more fully alleged herein, the Small Business Lending Rule is an illegal content-based restriction on speech which violates both 15 U.S.C. §1691c-2(c) and the First Amendment of the Constitution of the United States because it illegally provides in 12 C.F.R. §1002.107(c)(1) that a covered financial institution "shall not discourage an applicant from responding to requests for applicant-provided data…."

3.      As part of their requested relief, the Plaintiffs will also be seeking a preliminary injunction that enjoins the Defendants from implementing and enforcing the Small Business Lending Rule against them during the pendency of this action.  Such a preliminary injunction has already been issued by the United States District Court for the Southern District of Texas (the "Texas Federal Court") in a lawsuit, Case No. 7:23-cv-00144, filed by the Texas Bankers Association, Rio Bank, and the American Bankers Association against the Defendants in this action. However, that injunction is limited to members of the Texas Bankers Association and the American Bankers Association.  The named Plaintiff banks in Kentucky, as well as numerous other banks that are members of the Kentucky Bankers Association, are not members of either trade association that were granted relief in the Texas case, so they seek protections equal to those already granted by the Texas Federal Court.

**Parties**

4.      Plaintiff, The Monticello Banking Company ("Monticello Bank"), is a Kentucky

state-chartered bank with its main office located at 50 N. Main Street, Monticello, Wayne County, Kentucky 42633. It also has branches in Barren, Boyle, Casey, Clinton, Fayette, Harlan, Jefferson, Jessamine, Laurel, Madison, Pulaski, Russell, Warren and Wayne counties in Kentucky. It was established in 1895, and its growth is a result of its dedication to its goal of providing premier financial products, superior customer service, and "straight answers" from friendly, interested personnel. It anticipates that it would fall within the category of covered financial institutions under the Small Business Lending Rule that will have originated between 500 to 2,500 covered credit transactions for small businesses in each of calendar years 2022 and 2023.

5.      Plaintiff, Citizens Deposit Bank Of Arlington, Inc. ("Citizens Deposit"), is a Kentucky state-chartered bank with its main office located at 1 Walnut Street, Arlington, Carlisle County, Kentucky 42021. It also has branches in Ballard and McCracken counties in Kentucky. It was chartered in 1949. Like all community banks, it views itself as banking with friends, neighbors and relatives. It works to maintain a reputation of being a hometown bank with excellent customer services providing products and services equivalent to the largest banks in the country. Citizens Deposit is not a HMDA reporter so it does not have significant experience tracking and reporting to government agencies loan-level information. It anticipates that it would fall within the category of covered financial institutions under the Small Business Lending Rule that will have originated between 100 to 500 covered credit transactions for small businesses in each of calendar years 2022 and 2023.

6.      Plaintiff, First Community Bank Of The Heartland, Inc. ("First Community"), is a Kentucky state-chartered bank with its main office located at 114 E. Jackson Street, Clinton, Hickman County, Kentucky 42031. It also has branches in Ballard and Graves counties in

Kentucky. It traces its origins to the First National Bank in Clinton that was chartered in 1934. Its passion is to execute community banking at its very best by providing the best possible banking solutions in a way that supports and betters its customers' lives. First Community is not a HMDA reporter so it does not have significant experience tracking and reporting to government agencies loan-level information. It anticipates that it would fall within the category of covered financial institutions under the Small Business Lending Rule that will have originated between 100 to 500 covered credit transactions for small businesses in each of calendar years 2022 and 2023.

7. Plaintiff, First Southern National Bank ("First Southern"), is a national bank with its main office located at 27 Public Square, Lancaster, Garrard County, Kentucky. It also has branches in Caldwell, Christian, Fayette, Jessamine, Lincoln, Logan, Madison, Muhlenberg, Pulaski, Warren, and Wayne counties in Kentucky. It traces its origin to the National Bank of Lancaster that was established at the end of the Civil War. It anticipates that it would fall within the category of covered financial institutions under the Small Business Lending Rule that will have originated between 500 to 2,500 covered credit transactions for small businesses in each of calendar years 2022 and 2023.

8. Plaintiff, Morgantown Bank & Trust Company ("Morgantown Bank"), is a Kentucky state-chartered bank with its main office located at 201 N. Main Street, Morgantown, Butler County, Kentucky 42261. It also has branches in Bowling Green, Warren County, Kentucky and a loan production office in Nashville, Davidson County, Tennessee. It was established in 1880 by a special handwritten charter signed by the then Kentucky Governor, Luck Blackburn. Throughout its history, Morgantown Bank has weathered wars, floods, depressions and other setbacks, but it has never closed its doors or ceased serving the banking

needs of its customers, including large and small business customers.  It anticipates that it would fall within the category of covered financial institutions under the Small Business Lending Rule that will have originated between 100 to 500 covered credit transactions for small businesses in each of calendar years 2022 and 2023.

9.      Plaintiff, The Farmers Bank of Milton, Ky. ("Farmers Bank"), is a Kentucky state-chartered bank with its main office located at 41 Ferry Street, Milton, Trimble County, Kentucky 40045.  It also has branches in Carrol, Jefferson, and Oldham counties in Kentucky.  It was established in 1902.  Farmers Bank is locally owned and managed by people who know their customers and are interested in and care about the region where it operates.  It anticipates that it would fall within the category of covered financial institutions under the Small Business Lending Rule that will have originated between 100 to 500 covered credit transactions for small businesses in each of calendar years 2022 and 2023.

10.     Plaintiff, The Peoples Bank, Marion, Kentucky ("Peoples Bank"), is a Kentucky state-chartered bank with its main office located at 116 S. Main Street, Marion, Crittenden County, Kentucky 42064.  It also has a branch in Glasgow, Barren County, Kentucky.  It was established in 1946 following the end of World War II.  It is a small community bank, but its employees have over 150 years of banking experience.  It works to provide a personal, one on one approach to the business of banking with a friendly, hometown feeling that its current and future customers would expect from a local bank headquartered on the Main Street of the town where it was founded.  It anticipates that it would fall within the category of covered financial institutions that will have originated between 500 to 2,500 covered credit transactions for small businesses in each of calendar years 2022 and 2023.

11.     Plaintiff, The Sacramento Deposit Bank ("Sacramento Deposit") is a Kentucky

state-chartered bank with its main office located at 335 Main Street, Sacramento, McLean County, Kentucky 42373, and a branch office in Caneyville, Grayson County, Kentucky. It was established in 1895, and it has been successfully serving the banking needs of its customers, including large and small business customers, ever since. It anticipates that it would fall within the category of covered financial institutions that will have originated between 100 to 500 covered credit transactions for small businesses in each of calendar years 2022 and 2023.

12.    Plaintiff, Kentucky Bankers Association, (the "KBA"), is a Kentucky non-stock, nonprofit corporation created pursuant to KRS 273.161 through 273.369 and having its offices at 600 W. Main Street, Suite 400, Louisville, Kentucky 40202.

A.    The KBA is a trade association having as members approximately 150 national banks, state banks and savings banks representing virtually all of the commercial banking industry in Kentucky.

B.    Plaintiffs, Monticello Bank, Citizens Deposit, First Community, First Southern, Morgantown Bank, Farmers Bank, Peoples Bank, and Sacramento Deposit (individually or collectively referred to herein as the "Plaintiff Banks"), are all members of the KBA, but none of them are members of either the Texas Bankers Association or the American Bankers Association.

C.    The KBA has been in existence since 1891, and it was formally incorporated in its present form in 1911. According to Article III of the KBA's Articles of Incorporation, the "purposes of the Association are to promote the general welfare and usefulness of banks, trust and title companies, and financial institutions doing business in the Commonwealth of Kentucky; to cultivate a more intimate social and business relation between the representatives of such institutions; to collect and disseminate financial and economic information; to secure unity of action

in all matters affecting the common welfare of such institutions; and to promote the educational, financial, industrial, commercial, ecological and agricultural interests of the Commonwealth."

D.      All of the members banks of the KBA would be a "covered financial institution" within the meaning of the Small Business Lending Rule (12 C.F.R. §1002.105(b)) or would need to engage in record keeping and analysis to determine whether or not they would be a be a "covered financial institution".  Accordingly, the KBA appears to represent the interests of all of its bank members (the "KBA Member Banks").

E.      In addition, the KBA has itself extended staff time and money on account of the Small Business Lending Rule in answering questions from its members about the Small Business Lending Rule, designing and providing training materials about it, and otherwise addressing the impacts of the Small Business Lending Rule on its members.

13.     Defendant, CFPB, is an agency of the United States of America.

14.     Defendant, Rohit Chopra, is the Director of the CFPB, and he is sued in his official capacity as the Director of the CFPB.

## Jurisdiction And Venue

15.     This Court has jurisdiction over the subject matter of this case Court pursuant to 28 U.S.C. §1331 because this is a civil action arising under the Constitution, laws, or treaties of the United States.

16.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(e)(1) because Defendants include a United States agency and an officer sued in his official capacity and because Plaintiff, Monticello Bank is located in this district.

### General Allegations

A.      **The CFPB Generally.**

17.     Title X (§1001 to §1100H) of the Dodd-Frank Wall Street Reform And Consumer Protection Act (the "Dodd-Frank Act") established the CFPB and placed it in charge of regulating various financial products and services.

18.     Section 1021(a) of the Dodd-Frank Act (12 U.S.C. §5511(a)) requires CFPB to implement and enforce consumer finance law "consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products" and to ensure that "consumers are provided with timely and understandable information to make" their own "responsible decisions about financial transactions." Section 1022(b)(2) (12 U.S.C. §5512(b)(2)) provides that, in exercising its rulemaking authority, CFPB must consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule" and "the impact of proposed rules on covered persons . . . and the impact on consumers in rural areas."

B.      **The CFPB's Unconstitutional Funding Structure.**

19.     Section 1017 of the Dodd-Frank Act (12 U.S.C. §5497) created the funding mechanism for the CFPB in a way that wholly ignores and avoid the appropriations process that Article I, Section 9 of the Constitution of the United States requires.

20.     Recognizing the "staggering amalgam of legislative, judicial, and executive power in the hands of a single Director," the Fifth Circuit recently noted that the "[m]ost anomalous" aspect of CFPB "is the Bureau's self-actualizing, perpetual funding mechanism." *Community Fin. Servs. Ass'n of Am., Ltd v. Consumer Financial Protection Bureau*, 51 F.4th 616, 638 (5th Cir. 2021) (quoting *Consumer Financial Protection Bureau v. All American Check*

*Cashing, Inc.*, 33 F.4th 218, 221–222 (5th Cir. 2021)). "While the great majority of executive agencies rely on annual appropriations for funding, the Bureau does not. Instead, each year, the Bureau simply requisitions from the Federal Reserve an amount 'determined by the Director to be reasonably necessary to carry out' the Bureau's functions." *Community Fin.,* 51 F.4th at p. 638 (citing 12 U.S.C. §5497(a)). CFPB thus "receives funding directly from the Federal Reserve, which is itself outside the appropriations process through bank assessments." *Id.* According to the Fifth Circuit, "Congress did not merely cede direct control over the Bureau's budget by insulating it from annual or other time limited appropriations. It also ceded indirect control by providing that the Bureau's self-determined funding be drawn from a source that is itself outside the appropriations process -- a double insulation from Congress's purse strings that is unprecedented across the government." *Id.* at 638–39.

21.     "But Congress went to even greater lengths to take the Bureau completely off the separation-of-powers books. Indeed, it is literally off the books: Rather than hold funds in a Treasury account, the Bureau maintains 'a separate fund,' the 'Bureau of Consumer Financial Protection Fund,' which shall be maintained and established at a Federal Reserve bank. 'This fund is under the control of the Director,' and the monies on deposit are permanently available to him without any further act of Congress. Thus, *contra* the Federal Reserve, the Bureau may 'roll over' the self-determined funds it draws *ad infinitum.*" *Id.* at p. 639 (citations omitted). For those reasons, the Fifth Circuit held that CBPB's "funding apparatus cannot be reconciled with the Appropriations Clause and the clause's underpinning, the constitutional separation of powers." *Id.* at p. 642.

22.     The Fifth Circuit in *Community Financial Services* further held that a rule promulgated by the CFPB is invalid when it harms a plaintiff through its improper use of

unappropriated funds to engage in rulemaking. *Id*. at p. 643.

23.     The Supreme Court of the United States has granted a petition for a writ of certiorari filed by the CFPB to review the Fifth Circuit's decision in *Community Financial Services*. *See Community Financial Protection Bureau v. Community Fin. Servs. Ass'n of Am., Ltd.*, 215 L.Ed.2d 104, 143 S. Ct. 978 (Feb. 27, 2023).  As of the filing date of this Complaint, there has been no ruling by the Supreme Court of the United States in that proceeding.

### C.     The Proposed Small Business Lending Rule.

24.     Section 1071 of the Dodd-Frank Act consists of four pages of statutory text amending the ECOA to allow the CFPB to "inquire whether the business is a women-owned, minority-owned, or small business" and require that accumulated data be submitted annually to the CFPB. *See* 15 U.S.C. 1691c-2(b). To that end, the Act directed financial institutions to collect only the limited information specified in §1071.  A copy of Section 1071 is attached hereto as **Exhibit 1** and incorporated herein by reference.

25.     On September 1, 2021, the CFPB issued a Proposed Rule that, according to CFPB, implemented these statutory directives from § 1071. *Small Business Lending Data Collection under the Equal Credit Opportunity Act (Regulation B)*, 86 Fed. Reg. 56,356, 2021 WL 4636032 (Oct. 8, 2021) (the "Proposed Rule").

26.     Rather than complying with the Dodd-Frank Act, the CFPB's Proposed Rule proposed vastly expanding the categories of information to be reported by lenders. Indeed, the Proposed Rule added almost 70 additional categories to § 1071's list of data and sub-data points. Those included, among other things, loan guarantees, loan terms, counteroffers, denial reasons, comprehensive pricing information, origination charges, annual fees, broker fees, prepayment penalties, number of workers, and time in business.

27.     During the notice and comment period, the overwhelming number of comments submitted by parties subject to the Proposed Rule characterized it as excessively overbroad in terms of its data points and pointed out the negative impact and substantial costs it would have on the small business lending market.

28.     Importantly, the Conference of State Bank Supervisors ("CSBS") – an organization consisting of state-government officials who regulate and supervise the seven Plaintiff Banks that are state-chartered and that is "charged with protecting consumers and ensuring the safety and soundness of the financial institutions they supervise" in addition to "fostering economic development opportunities within their states" – spoke out against the overreach of the Proposed Rule. *See* CSBS Comment Letter (01/06/2022) *(*https://www.csbs.org/policy/statements-comments/small-business-lending-data-collection-under-equal-credit-opportunity*)*.  The CSBS warned that the Proposed Rule "will likely hinder the ability of community banks to continue to serve as an important source of small business credit in communities across the country." *Id.* The CSBS thus urged the CFPB to "limit the reportable data to the statutorily mandated data points required by section 1071 . . . [and] refrain from using its discretionary authority to require collection of additional data points until it is proven that the discretionary information is necessary to fulfill the purposes of section 1071." *Id.*

29.     The American Financial Services Association commented to the CFPB that, while the Proposed Rule stated that it is intended to "help small businesses drive inclusive and equitable growth," the overly burdensome data collection requirements that exceeded the Congressional mandate could result in a reduction of available credit, thus having the opposite effect of what Congress intended. *See* https://afsaonline.org/2022/01/06/afsa-submits-comment-

letter-regarding-small-business-lending-data-collection/. Echoing that concern, the U.S. Small Business Administration's Office of Advocacy commented that the CFPB's approach "may be unnecessarily burdensome to small entities, may impact the cost of credit for small businesses and may lead to a decrease in lending to small, minority- and women-owned businesses." *See* https://advocacy.sba.gov/2022/01/20/advocacy-submits-response-to-cfpbs-notice-of-proposed-rulemaking-on-small-business-lending-data-collection/.

30.     The KBA submitted a comment letter dated December 10, 2916, on the CFPB's proposed regulation.  *See* https://www.regulations.gov/comment/CFPB-2021-0015-0336.  The KBA's comments explained why the proposed regulation would limit access to credit for small businesses because the compliance costs would adversely affect covered institutions, particularly those on the smaller size range and reduce the amount of small business lending available in the community markets they serve.  The KBA's comments also explained that the proposed regulation was not narrowly tailed to serve its purpose of identifying small business and community development needs.  It discussed how the proposed regulation was duplicative of current bank regulatory regulations and review.  It also demonstrated why the CFPB did not have the capacity or correct fields to analyze the excessive amounts of data it was proposing to create.

31.     The KBA, along with 50 other state bankers associations, joined with the American Bankers Association, to submit an extensive comment letter dated January 6, 2022. *See  https://www.regulations.gov/comment/CFPB-2021-0015-1715*.  The  forty-seven  pages discussed scores of flaws in the proposed regulation, all of which are incorporated herein by reference.  As the comment noted, "ABA and others have repeatedly expressed concern about the costs of the rule" including that "its cost estimates … were too low" while it "also overstates the rule's benefits for fair lending."  One critical point presented to the CFPB was that "the 1071

rule will drive further consolidation [of the banking industry], and the gradual loss of community banks. Reduced competition will lead to fewer choices and higher prices for small businesses."

32.    In their combined letter, the National Association of Federal Credit Unions and the Credit Union National Association commented that "the Proposed Rule's complexity and significant costs will weigh disproportionately on credit unions in ways that ultimately lead to fewer and less favorable outcomes for all small business borrowers." Letter from Nat'l Ass'n of Fed. Credit Unions (Jan. 6, 2022).

33.    In their January 6, 2022, comment, the Community Development Bankers Association ("CDBA") pointed out that, "[w]hile the cost of any single new regulation . . . is manageable for many large institutions, the sheer volume of the many new regulations that have gone into effect since the law's passage is overwhelming – particularly for small institutions." *See* CDBA Comment Letter (Jan. 6, 2022) (cdbanks.org/advocacy). According to CDBA, the Proposed Rule could have the "unintended negative outcome of forcing the smallest lenders to abandon [women-owned, minority-owned, and small business lending] because it is no longer profitable and/or the compliance risks are too great." *Id.*

34.    The Independent Community Bankers Of America (the "ICBA"), in a January 6, 2022 letter, provided section by section comments, pointing out, among other things, the extraordinary costs and other burdens the Proposed Rule would have on community banks, especially the smallest community banks, and their small business customers. *See* ICBA's January 6, 2022, letter at p. 32 (https://www.icba.org/advocacy/letters-testimony).

35.    The ICBA further explained to the CFPB that the results of its membership survey that demonstrated that the largest cost associated with the Proposed Rule would be the necessity for community banks to hire additional employees:

In contrast to large banks that employ thousands of employees to manage compliance, approximately 80% of community banks surveyed reported employing 25 or fewer full-time employees ("FTEs") dedicated to small business lending. 50% employed 10 or fewer FTEs in a small business lending role. These small staffs are already stretched thin and will require significant retraining to comply with the proposed rule. As a result, 58% of community banks surveyed reported that they will likely be required to hire additional FTEs in order to comply with the rule.

If a bank is required to hire even one additional FTE, the cost estimate would exceed the Bureau's own estimated time commitment to 716 staff hours per year for small . . . depository institutions. This time estimate amounts to 17.9 weeks of full-time work per year, or about 1/3 of a single FTE.

*Id*.

### D.      The CFPB's Failure To Perform A Proper Cost/Benefit Analysis.

36.      Federal agencies like the CFPB are required to consider the costs and benefits of regulations that are expected to have large economic effects to ensure that the benefit of a regulatory initiative justifies its costs. *See, e.g.*, Executive Order 12291 (46 Fed. Reg. 13,193 (Feb. 17, 1981) (1981 WL 404143); Executive Order 12866 (58 Fed. Reg. 51,735 (Sept. 30, 1993) (1993 WL 13149641).

37.      The CFPB claims to have undertaken a cost-benefit analysis of the Proposed Rule. The analysis and the results it produced, however, were incomprehensible.

38.      First, CFPB claimed to have used an analysis that it described as "[a] Bayesian independent univariate conditional multiple ordinary least squares (OLS) regression model." CFPB *Supplemental Estimation* at 4 (September 2021) (https://files.consumerfinance.gov/f/documents/cfpb_section-1071-nprm-supplemental-estimation-methodologies_report_2021-09.pdf). According to CFPB, it used that model "because the data are missing at random," and it "need[ed] to impute data for multiple variables, origination number and dollar volume." *Id.* The CFPB further claimed that the missing variables are "monotone," and it therefore used "an independent univariate conditional model to generate the multivariate

imputations." *Id.* That methodology not only is incomprehensible, but also it fails to account for the higher proportion of small business loans generated by rural, small, and other community banks.

39.     It later became evident that the CFPB did not even attempt to estimate the full extent of lenders' costs. This was evident in three ways.

A.     First, the CFPB admitted that its Cost Survey was limited to only 13 of the eventual 81 data fields.

B.     Second, the CFPB claimed that it "c[ould] only estimate how ongoing costs would be different," but suggested that "going from 13 statutory data points to 81 in the Final Rule would increase compliance costs by $10,000,000 per year." 86 Fed. Reg. at p. 56,354.

C.     Third, the CFPB did not differentiate aggregate industry numbers between banks of different sizes to account for the fact that total small-business loans as a percentage of total loans decline as bank size increases as established by researchers at Texas Tech University. In their comment letter to CFPB, the Texas Tech researchers submitted data indicating that, for banks with $100 million or less in total assets, small-business loans comprised approximately 40 percent of the total loan portfolio, but for banks with more than $10 billion in total assets, small-business loans are only about 10 percent of their portfolios. *A Comment on Implementing Section 1071 of the Dodd-Frank Act*, Texas Tech University Rawls College of Business (Dec. 16, 2021) (https://www.depts.ttu.edu/rawlsbusiness/news/posts/2021/12/bankers_digest_dodd_frank.php).     In other words, compliance costs for the Proposed Rule (and also the final Small Business Lending Rule) would affect community banks and smaller lending institutions like the Plaintiff Banks disproportionately because of the greater percentage of small-business loans that make up the business of those lenders.

### E.    The Final Small Business Lending Rule.

40.    In the final Small Business Lending Rule, the CFPB expanded Congress' four-page mandate in the Dodd-Frank Act into massive Final Rule that took 421 pages of three-column, single spaced Federal Register pages to announce and explain.  *See* Small Business Lending Under The Equal Credit Opportunity Act (Regulation B), 88 Fed. Reg. 35,150 to 35,571 (May 31, 2023) (the "2023 Federal Register Final Rule Notice").  Attached hereto as **Exhibit 2** and incorporated herein by reference is a true and correct copy of the 2023 Federal Register Final Rule Notice.  The specific amendments to 12 C.F.R. Part 1002 appear on pages 35,527 through 35,533.

41.    Concurrent with the publication of the Final Rule, the CFPB issued a forty page "Small Business Lending Rule: Data Points Chart" that sets forth 81 separate data or sub-data points. Attached hereto as **Exhibit 3** and incorporated herein by reference is a true and correct copy of the Data Points Chart (https://files.consumerfinance.gov./f/documents/cfpb_small-business-lending-data-points-chart.pdf).

42.    Further illustrating the complexity of the Small Business Lending Rule is the 123 page "Filing instructions guide for small business lending data collected in 2024" that has been issued by the CFPB (the "CFPB Filing Instructions Guide").  Attached hereto as **Exhibit 4** and incorporated herein by reference is a true and correct copy of the CFPB Filing Instructions Guide.  The very first page of this guide states that bank employees that will need to review and use the guide are "Staff who collect, prepare, and submit data," as well as "Technology support staff" and also "Compliance officers."  The time and expense that will be incurred by all of these types of employees, and likely consultants and/or third-party technology vendors, of the Plaintiff Banks will be excessive.

43.    In the supplementary material accompanying publication of the Small Business Lending Rule, the CFPB acknowledged that, during the rulemaking process, it rejected "an alternative

approach that would have limited data collection only to the statutorily required data points enumerated in section 1071." Tellingly, CFPB did not dispute the comments of the U.S. Small Business Administration's Office of Advocacy, but merely dismissed them with a notation that "it expects the variable portion of ongoing costs to be passed on to small business credit borrowers in the form of higher interest rates and fees." 88 Fed. Reg. at p. 35,521. The CFPB similarly ignored other outside comments, issuing the Final Rule in substantially the same form as was proposed without even attempting to justify why it dismissed the concerns made known during the notice and comment period.

44. The CFPB also disclosed that the respondents to its "One-Time Cost Survey were instructed to assume that they would only be reporting on the mandatory (i.e., statutory) data fields." *See* 88 Fed. Reg. at p. 35,517. In terms of justifying the regulatory enlargement, the CFPB boldly and without justification asserted that expanding the collection requirements with an additional 68 (non-statutory) data points "would aid in fulfilling the purposes of section 1071." *See* 88 Fed. Reg. at p. 35,526.

**F.      Immediate And Irreparable Harm Caused By The Small Business Lending Rule.**

45. The Final Rule is effective August 29, 2023. *See* 88 Fed. Reg. at p. 35,150. As a result, the Plaintiff Banks, the KBA and the KBA Member Banks must begin immediately to incur substantial expenses in preparation for the implementation of the Final Rule.

46. Already, the KBA has scheduled a 1071 Small Business Lending Data Collection seminar to take place on August 31, 2023.  The KBA has also been fielding numerous questions from the KBA Member Banks about the Small Business Lending Rule.  Being in a position to respond to these questions takes staff time and expense.

47. For the Plaintiff Banks, and any of the other KBA Member Banks that reasonably believe they will be required to submit data to the CFPB under the Small Business Lending Rule, that

compliance activity will include selecting new computer software systems (that are yet to be created to address both the data gathering and reporting requirements of the Rule) or upgrading existing software systems; training employees; and hiring personnel and/or consultants for the implementation of the information collection, report preparation, intra-company segmentation procedures, and overall privacy protection needed to safeguard the extensive accumulation of personal, demographic, and sexual orientation data mandated by the Final Rule.

48.     The over-reaching Final Rule will force small and rural banks with limited staff and resources to put more resources into government reporting rather than lending in the community. In addition, federal and state financial regulatory authorities will require community banks, including the Plaintiff Banks and the KBA Member Banks, to demonstrate their progress toward identifying and initiating compliance with the Final Rule during examinations and other agency communications. As noted by the CFPB, it expected these costs to be recovered by charging higher interest rates or otherwise increasing loan charge -- responses that will harm the very persons the CFPB is charged with protecting.  As the commentators to the Proposed Rule noted, the growing burden of these compliance expenses will encourage consolidation in the industry, reducing competition and locally focused service.

49.     All of the Plaintiff Banks have begun working to comply with the Small Business Lending Rule, and they are currently expending time, effort, and expense that they would not be incurring if the Small Business Lending Rule had been properly promulgated in accordance with applicable law.  For example, Monticello Bank will be assembling a compliance team which it expects will have ten (10) full-time equivalent employees and cost $50,000.  It will have to purchase new computer software to both assemble data and then to submit data to the CFPB with a current estimated cost of $20,000.  It plans on incurring expenses for staff training and attending seminars at a cost of

$5,000.  It expects to have to hire at least one new employee to implement the Small Business Lending Rule at a cost of not less than $50,000.  It will have to change its record retention practices for a cost it expects will be roughly $10,000.  There will be the ongoing costs of continued compliance. To pay these costs, it will be considering these compliance costs in setting loan pricing, potentially raising rates and fees on small business loans, and raising or charging loan origination fees on small business loans. The other seven Plaintiff Banks are and will be incurring similar expenses, though the specific amounts are likely to vary on account of differences in bank size, staff capacity and expertise, and computer systems.

50.     Compounding the harm caused by the final Small Business Lending Rule itself is the CFPB's inability to safeguard the information it seeks from its regulated entities, much of which is personal and confidential. *See* 15 U.S.C. § 5512(c)(8) (requiring CFPB to protect proprietary, personal, and confidential information).

51     In 2023, the CFPB learned that it had experienced a data breach involving sensitive information on several financial institutions which has been reported as involving approximately 256,000 consumer accounts at a single institution. *See CFPB's 'Disturbing' Data Breach Sparks Ire, Credibility Doubts*, Law 360 (Apr. 26, 2023) (https://www.law360.com/articles/1601072/cfpb-s-disturbing-data-breach-sparks-ire-credibility-doubts); "*CFPB Says Employee Breached Data Of 250,000 Consumers In 'Major Incident'*," Politico (Apr. 19, 2023) (https://www.politico.com/news/2023/04/19/cfpb-employee-consumer-data-breach-00092919).

52.     According to the *American Banker,* even though the CFPB learned of the breach on February 14, 2023, the CFPB still had not notified affected consumers more than two months later. *See* "*CFPB Still Has Not Notified Consumers About Data Breach*," American Banker (Apr. 24, 2023) (https://www.americanbanker.com/news/cfpb-still-has-not-notified-consumers-about-data-breach).

53.     Both the occurrence of the data breach and its delay in reporting demonstrates that CFPB is not prepared to respond to a data breach, further indicating that CFPB is unable to adequately assess the security and privacy impacts of its massive data collection required by the final Small Business Lending Rule.

**G.      The Texas Federal Litigation Over The Small Business Lending Rule.**

54.     On April 26, 2023, the Texas Bankers Association and Rio Bank, McAllen, Texas filed a Complaint in the United States District Court for the Southern District of Texas, McAllen Division, Case No. 7:23-cv-00144 (the "Texas CFPB Lawsuit"), challenging the legality of the Small Business Lending Rule.

55.     On May 14, 2023, a First Amended Complaint was filed in the Texas CFPB Lawsuit which added the American Bankers Association as a Plaintiff.

56.     On July 31, 2023, the Chief United States District Judge Randy Crane entered in the Texas CFPB Lawsuit an "Order Granting In Part And Denying In-Part Plaintiffs' Motion For Preliminary Injunction" (the "Texas Preliminary Injunction").  Attached hereto as **Exhibit 5** and incorporated herein by reference is a true and correct copy of the Texas Preliminary Injunction.

57.     The Texas Preliminary Injunction preliminarily enjoined the CFPB and Director Chopra "from implementing and enforcing the Final Rule, 88 Fed. Reg. 35,150 (May 31, 2023), against Plaintiffs and their members pending the Supreme Court's reversal of *Cmty Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 623 (5th Cir. 2022), *cert. granted*, 215 L.Ed. 2d 104, 143 S. Ct. 978 (2023), a trial on the merits of this action, or until further order of this Court."  The Texas Preliminary Injunction further "ORDERS that all deadlines for compliance with the requirements of the Final Rule are stayed for Plaintiffs and the members…."

58.     The Plaintiff Banks, the KBA, and many of the KBA Member Banks are not protected by the Texas Preliminary Injunction because they are not members of the Texas Banks Association or the American Bankers Association, and the CFPB argued in the Texas CFPB Lawsuit against expanding the scope of parties entitled to relief.  In Kentucky, a member of the American Bankers Association has protection under the Preliminary Injunction entered in the Texas Case.  However, the Plaintiffs Banks, who are all small community banks making covered credit transactions in their communities, are not protected, and seek similar relief from this Court.

59.     The Plaintiff Banks, and all KBA Member Banks who are not also members of the ABA (the "Unprotected Banks"), are unfairly and inequitably treated differently from the banks protected by the Texas Preliminary Injunction.  The banks within the scope of the Texas Preliminary Injunction can cease paying compliance expenses and altering their business practices pending a ruling on the merits of their claims.  However, the Unprotected Banks do not have this protection at this time. They have to pay compliance expenses, divert employee time and energy from normal operations to work complying with the Final Rule, and alter their business practices, even if the Final Rule is later struck down.

### COUNT 1
### Violation of the Constitution and APA
### (Article I, § 9, Clause 7; 5 U.S.C. § 706(2)(A))

60.     Plaintiffs incorporate by reference and reallege each and every allegation contained in Paragraphs 1 through 59 above.

61.     As the Fifth Circuit held in *Community Financial* and the Texas District Court recognized in the Texas Preliminary Injunction, the CFPB's funding structure violates the U.S. Constitution's separation of powers. Further, CFPB promulgated the Final Rule under precisely the same procedures as the rule that the Fifth Circuit set aside in Community Financial.

62.     Because the CFPB issued the Final Rule with funds derived from unconstitutional sources, it violates the Constitution. *Community Financial*, 51 F.4th at p. 642. Accordingly, the Final Rule is invalid, and the Court should set it aside. *See id.* at p. 643.

63.     Under the APA, agency action must be vacated if it is "not in accordance with law," 5 U.S.C. § 706(2)(A). For the reasons described above, the Final Rule is not in accordance with law and therefore must be set aside. *See Community Fin.*, 51 F.4th at p. 643.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in their Prayer for Relief below.

## COUNT 2
### (Violation of 5 U.S.C. § 706(2)(C))

64.     Plaintiffs incorporate by reference and reallege each and every allegation contained in Paragraphs 1 through 63 above.

65.     The APA provides that agency actions are to be set aside when found to exceed or contravene the agency's statutory authority. 5 U.S.C. § 706.

66.     Although the CFPB claims to be merely collecting "additional data that [it] determine[d] would aid in fulfilling section 1071's statutory purposes" (88 Fed. Reg. 35,150), the additional information demanded by the Final Rule far outstrips the statute's purposes. In fact, the Final Rule will operate to undermine the express purpose of the statute.

67.     By adding even more burdensome compliance requirements on institutions such as the Plaintiff Banks and the KBA Member Banks, the Small Business Lending Rule will work to decrease the number of banks willing to make loans to small businesses.  It will also increase the borrower costs of loans to small businesses.  The result of the Small Business Lending Rule will be to harm those businesses Congress intended to protect.

68.     Because the Small Business Lending Rule violates the terms of the statue, all data

points in excess of the 13 specified in the underlying statute should be invalidated and set aside.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in their Prayer for Relief below.

**COUNT 3**
**(Violation of 5 U.S.C. § 706(2)(A))**

69.　Plaintiffs incorporate by reference and reallege each and every allegation contained in Paragraphs 1 through 68 above.

70.　The APA requires that federal agencies such as the CFPB respond to relevant and significant issues that are raised by interested parties. Further, a reviewing court "must set aside agency action if the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of US v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). The notice and comment period alerted the CFPB to the alarming costs that would be imposed on the small to mid-sized banks if the Final Rule were to expand the statutory categories. As set forth above, however, CFPB acted arbitrarily and capriciously by failing to consider and respond to significant comments raised by adversely affected parties.

71.　Because the Small Business Lending Rule is arbitrary and capricious within the meaning of the APA, the Court should invalidate it and set it aside.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in their Prayer for Relief below.

## COUNT 4
### (Violation of 5 U.S.C. § 706(2)(A) and (C))

72.     Plaintiffs incorporate by reference and reallege each and every allegation contained in Paragraphs 1 through 71 above.

73.     Federal agencies for decades have been required to consider the costs and benefits of regulations that are expected to have large economic effects to ensure that the benefit of a regulatory initiative justifies its costs. Moreover, section 1022(a) of the Dodd-Frank Act commands that CFPB consider "the potential benefits and costs to consumer and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule" and "the impact of proposed rules on covered persons . . . and the impact on consumers in rural areas."

74.     Nonetheless, the CFPB promulgated the final Small Business Lending Rule without undertaking a proper cost/benefit analysis. To begin, CFPB failed to account for the disproportionate cost of the Final Rule on small banks (that make the most loans to small businesses), such as the Plaintiff Banks, and the fact that the Final Rule likely will cause a decrease in loan availability to women and minority owned businesses. Instead, the CFPB merely conceded that additional costs would be "passed on to small business credit borrowers in the form of higher interest rates and fees" (88 Fed. Reg. 35,521), thus harming all small businesses.

75.     Further, instead of undertaking a proper accounting, the CFPB took the costs associated with collecting only the 13 statutory data points required by § 1071, ignoring the costs and burden associated with collecting 81 different types of information. Regardless, CFPB forged ahead with promulgating the Final Rule.

76.     "Illogic and internal inconsistency are characteristic of arbitrary and unreasonable agency action." *U.S. Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 382 (5th Cir.

2018). Without meaningful distinctions with respect to separating cost estimates based on the differential in the size of the small business loan portfolio per the amount of a given bank's assets, the compliance costs which have been factored into the Final Rule are unsubstantiated. Accordingly, CFPB "entirely failed to consider [this] important aspect of the problem," and, at a minimum, it failed to articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfg Assn. v. State Farm Mutu. Auto Ins. Co,* 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). In addition, the Final Rule conflicts with the Dodd-Frank Act's express command that the CFPB evaluate costs and benefits in promulgating rules.

77.     Because the Small Business Lending Rule is arbitrary and capricious within the meaning of the APA and in violation of the CFPB's statutory authority, the Court should invalidate it and set it aside.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in their Prayer for Relief below.

## COUNT 5
### (Violation of 15 U.S.C. §1691c-2(c), The First Amendment, And The APA)

78.     Plaintiffs incorporate by reference and reallege each and every allegation contained in Paragraphs 1 through 77 above.

79.     As part of their business operations, the Plaintiff Banks' staff regularly discuss with their customers the practices of their various banking operations.  The website of Plaintiff, Monticello Bank, specifically notes that its goal is to provide "straight answers from friendly, interested personnel". *See* https://www.mbcbank.com/.

80.     However, the CFPB Final Rule purports to prohibit and penalize covered financial institutions that provide "straight answers" about a customer's right not to provide any

information requested from them in connection with the data collection requirements set forth in Section 1071.

81.    15 U.S.C. §1691c-2(c) states:

(c)    RIGHT TO REFUSE – Any applicant for credit may refuse to provide any information requested pursuant to subsection (b) in connection with any application for credit.

82.    15 U.S.C. §1691-2(b) provides that inquiries by financial institutions about whether an applicant for credit is a women-owned, minority-owned, or small business, may be made only it if is done "Subject to the requirements of this section".

83.    In 15 U.S.C. §1691c-2(g)(3), Congress directed that the "Bureau shall issue guidance designed to facilitate compliance with the requires of this section, including assisting financial institutions in working with applicants…."

84.    The direction of the CFPB in the Small Business Lending Rule is not in accordance with requirements of Section 1071 because it does not permit the Plaintiff Banks to truthfully advise that an applicant for credit may refuse to provide any information that the Small Business Lending Rule would otherwise require to be collected.  This is because the Small Business Lending Rule provides in 12 C.F.R. §1002.107(c)(1) that a covered financial institution "shall not discourage an applicant from responding to requests for applicant-provided data…."

85.    The CFPB's "Sample data collection form" that is Appendix E to the Small Business Lending Rule (88 Fed. Reg. at p. 35,534) further compounds the CFPB's improper actions because it forces a covered financial institution to speak in ways that it may not agree with.  Specifically, the third paragraph of the form, to be given to applicants for non-excluded transactions, states:  While you are not required to provide this information, we encourage you to do so." (Emphasis added).  However, there is nothing in Section 1071 that requires a lender to

express this opinion or desire.

86.     More disturbing is the CFPB's "Statement On Enforcement And Supervisory Practices relating To The Small Business Lending Rule" that was promulgated by the CFPB and published in the Federal Register on the same day the Rule was published.  *See* 88 Fed. Reg. 34,833-34,834 (May 31, 2023) (the "CFPB Enforcement Statement").   Attached hereto as **Exhibit 6** and incorporated herein by reference is a true and correct copy of the CFPB Enforcement Statement.

87.     Even though Section 1071 expressly provides that "Any applicant for credit may refuse to provide any information requested," the CFPB Enforcement Statement expresses the CFPB's position that "compliance lenders will seek to maximize the collection of responses from applicants."

88.     The CFPB Enforcement Statement specifically states:

The CFPB intends to pay particular attention to covered lenders' response rates for data requested from applicants….[T]he CFPB intends to consider, among other things, irregularities in a particular response (for example, very high rates, relative to similar lenders, of an applicant response of "I do not wish to provide this information" or similar)….

This is an express statement by the CFPB that the Plaintiffs are exposed to enforcement actions because their customers may exercise their statutory right to refuse to provide "any information requested."

89.     The provisions of 12 C.F.R. §1002.107(c)(1) and the CFPB Enforcement Statement violate the APA because they are "not in accordance with law."

90.     The provisions of 12 C.F.R. §1002.107(c)(1) further violate the First Amendment of the Constitution of the United States because it is an illegal content-based restriction on speech.

91.     The Plaintiff Banks have a statutory and constitutional right to truthfully tell applicants for credit that they may refuse to provide any information requested pursuant to Section 1071 in connection with any application for credit.

92.     Each Plaintiff Bank and its employees and other representatives have a statutory and constitutional right to truthfully tell applicants for credit its views on the reasonableness, burdens and requirements of Section 1071 and the Section 1071 Final Rule, including the right to request that an applicant for credit exercise its Congressionally enacted statutory right to refuse to provide any information requested pursuant to Section 1071.

WHEREFORE, Plaintiffs demand judgment against Defendants as set forth in their Prayer for Relief below.

### Prayer For Relief

WHEREFORE, Plaintiffs demand as follows:

I.      That this Court issue a final judgment declaring that the Small Business Lending Rule is invalid and unenforceable; and

II.     That this Court issue a preliminary injunction and then a final injunction enjoining implementation and enforcement of the Small Business Lending Rule; and

III.    That, in the alternative and in the event that some of the Small Business Lending Rule is valid, this Court issue a declaration that the provisions of 12 C.F.R. §1002.107(c)(1) of the Small Business Lending Rule are invalid and that Plaintiffs and their staff have a statutory and constitutional right to truthfully tell applicants for credit their views on the reasonableness, burdens and requirements of Section 1071 and the Small Business Lending Rule, including the right to request that an applicant for credit exercise his, her or its right to refuse to provide any information requested pursuant to Section 1071 or the Small Business Lending Rule; and

IV.    That Plaintiffs recover their costs herein expended, including reasonable attorneys' fees to the extent allowed by law, and receive any and all other relief to which they may appear entitled.

Respectfully submitted,

MORGAN POTTINGER MCGARVEY

By: _/s/ John T. McGarvey_____

Of Counsel:

Debra K. Stamper (KBA #83890)      John T. McGarvey (KBA #46230)
dstamper@kybanks.org                        jtm@mpmfirm.com
Kentucky Bankers Association            M. Thurman Senn (KBA #82343)
600 West Main Street                         mts@mpmfirm.com
Louisville, Kentucky  40202             401 South Fourth Street, Suite 120
(502) 582-2453                                   Louisville, Kentucky  40202
                                                        (502) 589-2780
                                                        *Counsel for Plaintiffs*

Ver. 08/11/23